**Benita GUTTER, Plaintiff,**

v.

**GUIDEONE MUTUAL INSURANCE COMPANY, Defendant.**

Civil Action No. 1:12–CV–2397–AT.

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed March 28, 2014.

Cheryl Barnes Legare, Edward D. Buckley, Buckley Law Firm, LLC, Atlanta, GA, for Plaintiff.

Julie Davis Loring, Anderson B. Scott, Fisher & Phillips, LLP, Atlanta, GA, for Defendant.

## *ORDER*

AMY TOTENBERG, District Judge.

Before the Court is Defendant GuideOne Mutual Insurance Company's Motion for Summary Judgment [Doc. 32]. Plaintiff Benita Gutter's claims are based on allegations that she was terminated one day after seeking leave under the Family and Medical Leave Act ("FMLA"). Defendant does not dispute that she was entitled to FMLA leave, but seeks summary judgment based on evidence that its termination of Plaintiff was unrelated to her request for such leave. As material issues of fact remain in dispute, Defendant's Motion for Summary Judgment [Doc. 32] is **DENIED**.

## I. Background

The following facts underlying this FMLA case are not in dispute. Plaintiff Benita Gutter started working for GuideOne in March 2006 as a staff litigation attorney. (Def. Resp. Pl. Material Facts, Doc. 47 ¶ 1.) Her supervisor was Associate General Counsel Sam Waters. (Pl. Resp. Def. Material Facts, Doc. 43 ¶ 6.) Ms. Gutter worked at GuideOne's Stone Mountain, Georgia location, and Mr. Waters was based at GuideOne's corporate headquarters in West Des Moines, Iowa. (*Id.* ¶¶ 5, 7.) GuideOne's litigation support staff, comprising paralegals and secretaries, also worked at the West Des Moines office. (*Id.* ¶ 8.)

## A. Performance Reviews

GuideOne employees typically receive annual performance reviews, and Ms. Gutter's first review covered the period from her hire date through March 2007. (*Id.* ¶ 38.) Her performance during that period met or exceeded expectations. (*Id.*) A year later she received her second performance review for the March 2007 through March 2008 period. (*Id.* ¶ 39.) In this review, Ms. Gutter received the same overall performance evaluation of meeting or sometimes exceeding expectations. (*Id.* ¶ 40.) However, Mr. Waters identified specific areas for improvement. Her review stated that she needed to improve her relationship with the GuideOne claims department and that she sometimes missed deadlines. (*Id.* ¶¶ 41–42.)

Ms. Gutter's third performance review took place on March 24, 2009. (*Id.* ¶ 47.) She received an overall rating of "meets expectations" for the March 2008 through March 2009 period. (*Id.* ¶ 48.) In this review, Mr. Waters noted that Ms. Gutter "habitually" failed to furnish meaningful and timely evaluations to the claims department. (*Id.* ¶ 49.) Ms. Gutter concurred that she had not demonstrated great improvement in her performance but attributed this to her excessive caseload. (*Id.* ¶ 52.)

On September 10, 2009, Mr. Waters placed Ms. Gutter on a Performance Improvement Plan ("PIP") because of her unacceptable performance. (Doc. 47 ¶ 6; Pl. Dep. at 101–102.) Ms. Gutter's PIP identified her failure to: (1) provide timely and thorough progress reports to her claims handlers; (2) maintain and update her electronic files; and (3) stick to specific work protocols created by the litigation support staff. (Doc. 43 ¶ 54.) To be removed from the PIP, Ms. Gutter needed to address each performance issue and complete all of her outstanding and deficient

reports. (*Id.* ¶ 60; Doc. 47 ¶ 7.) GuideOne gave her written notice that, for the one-year period following her removal from the PIP, it could fire Ms. Gutter if her performance returned to unacceptable levels. (Doc. 43 ¶ 59.) Additionally, GuideOne employees on a PIP are ineligible for bonuses or promotions until removed from the improvement plan. (*Id.* ¶ 62.)

Ms. Gutter was given until December 11, 2009 to complete her backlog of reports, and GuideOne took steps to ensure she would not accumulate new cases while on the PIP. (*Id.* ¶¶ 63–64.) After she did not complete her reports by December 11th, Mr. Waters later extended the deadline to February 1, 2010. (*Id.* ¶ 64; Doc. 47 ¶ 8.) Ms. Gutter was ultimately released from her PIP on February 1, 2010. (Doc. 47 ¶ 10.) Shortly after this, Mr. Waters told Ms. Gutter to resolve her differences with Beth Molln, a member of the litigation support staff, in a February 11, 2010 e-mail. (Doc. 43 ¶ 67; Gutter Dep. Ex. 9, Doc. 39–1 at 76.) Mr. Waters observed that Ms. Gutter's work mannerisms had "alienated" Ms. Molln. (Doc. 39–1 at 76.) Nevertheless, Ms. Gutter received a bonus of several thousand dollars in March 2010. (Doc. 47 ¶ 11.)

At this point, each party's version of events begins to diverge. The Court proceeds, as it must, by viewing the evidence and inferences in the light most favorable to Plaintiff, as the nonmoving party. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir.2007). On or about April 5, 2010, Ms. Gutter received her fourth and final performance review during her tenure at GuideOne. (Doc. 43 ¶ 68; Doc. 47 ¶ 12.) Of twelve scored metrics, Ms. Gutter received a "meets expectations" rating in two categories. (Doc. 43 ¶ 69.) She received a "needs improvement" rating in the remain-

ing ten categories but was not placed on a new PIP. (*Id.* ¶ 70.)

Mr. Waters provided explicit critical feedback in her review file. He wrote that Ms. Gutter had "squandered [her] positional power" to the point where most claims handlers would prefer not to work with her. (Gutter Dep. Ex 8., Doc. 39–1 at 72–75.) He noted that Ms. Gutter could improve the maintenance of her electronic case files, and that she should strive to file timely and thorough reports. (*Id.*) Mr. Waters also identified specific examples of her counterproductive behavior.[1] (*Id.*) The written review directed Ms. Gutter to prepare a development plan to incorporate this feedback and improve her performance. The evaluation indicated Ms. Gutter would be reevaluated in six months. (*Id.*)

Despite the critical language of her fourth review, Mr. Waters gave Ms. Gutter the impression that he was satisfied with her performance over the previous year.[2] (Doc. 47 ¶ 13.) He said they would review

her performance again in September 2010 and consider giving her a raise then. (*Id.* ¶ 15.)

## B. Ms. Gutter's Request for Leave

In April or May 2010, Ms. Gutter first told Mr. Waters that she might need to take a leave in the future. (Doc. 39 at 78; Doc. 47 ¶ 20.) She discussed how several external factors, including her divorce, a potential cancer diagnosis, and the death of her friend, were beginning to affect her work. (Doc. 39 at 78–79.) She did not make a formal request for leave then, nor did she tell Mr. Waters of any scheduled doctor's appointments. (Gutter Dep. at 159, Doc. 39–1 at 39.)

On July 13, 2010, Ms. Gutter informed Mr. Waters that she was going to request medical leave. (Doc. 47 ¶ 21.) The events immediately before and after this discussion are disputed; the following timeline represents Plaintiff's view.

| July 13, 2010 "afternoon" | • In a phone call that afternoon, Ms. Gutter told Mr. Waters, "tomorrow I'm going to go see my doctor and try to get leave." (Doc. 39–1 at 39.) |
| --- | --- |
| July 13, 2010 9:13 p.m. | • Ms. Gutter e-mailed Cathy Murray, the Vice President of Human Resources, to request short-term disability forms and information about taking a "mental health leave." (Gutter. Dep. Ex. 10, Doc. 39–1 at 79–81.) Ms. Gutter said she "need[s] to apply for disability," citing work as the primary source of stress. (*Id.*) |

1. For example, Mr. Waters criticized Ms. Gutter's failure to file a litigation pleading to obtain satisfaction of a judgment and her position that the opposing counsel should make the necessary correction. (Doc. 39–1 at 73–74.)

2. Defendant responds to this and other sections of Plaintiff's Statement of Material Facts by simply asserting the facts in question are immaterial. The Court deems such facts admitted in light of Defendant's failure to: (1) directly refute the movant's fact with concise responses supported by specific citations to evidence; (2) state a valid objection to the admissibility of the movant's facts; or (3) point out that the movant's citation does not

support the movant's facts or that the movant's facts are not material in accordance with the requirements of Local Rule 26.1(B)(2). *See Williams v. Slack*, 438 Fed. Appx. 848 (11th Cir.2011) (per curiam) (holding that district court did not err in deeming statements of material fact as admitted under Local Rule 56.1 where respondent did not directly refute the material facts set forth in the movants' statements of material facts with specific citations to evidence, and it otherwise failed to state a valid objection to the material facts). The Court finds Plaintiff's objections based on immateriality generally to be unfounded. *See, e.g.* Doc. 47 ¶¶ 11, 13–19, 21, 23.

| July 14, 2010 | • Mr. Waters told Ms. Gutter over the phone that her employment was terminated effective the last day of her FMLA leave.[3] (Gutter Decl., Doc. 44–1 ¶ 19; Gutter Dep. at 126.) |
|---|---|
| July 14, 2010 1:42 p.m. | • Ms. Murray responded to Ms. Gutter. Ms. Murray stated that Ms. Gutter's request was one for worker's compensation and that she was forwarding the request to Sara Moore, the Human Resources employee that handles leaves. (Doc. 39–1 at 80.) |
| July 14, 2010 1:54 p.m. | • Ms. Gutter acknowledged Ms. Murray's reply and asked her to "[p]lease forward the claim form and the policy for short-term disability." (Doc. 39–1 at 80.)<br>• Mr. Waters sent Ms. Gutter an e-mail stating "[t]his e-mail confirms that GuideOne has terminated you and that your last day is Friday August 13, 2010." Two other individuals, Marsha Levisay and Tom Farr, were copied on this e-mail. (Waters Dep. Ex. 12, Doc. 32–4 at 47.) |
| July 14, 2010 3:45 p.m. | • Sara Moore expressed that Ms. Gutter's claim was being treated as one for worker's compensation and instructed her to promptly see a physician that GuideOne utilized for worker's compensation. (Doc. 39–1 at 79.) |
| July 15, 2010 7:36 a.m | • Ms. Gutter responded to Ms. Moore's e-mail, attaching documents from her physician. She also asked Ms. Moore to forward her "claim form and other FEMLA [sic] documents." (Doc. 39–1 at 80.) |

Ms. Gutter's FMLA request was eventually approved and she took roughly four weeks of paid leave. (Doc. 39–1 at 13; Doc. 43 ¶ 84.) She was not reinstated to any position at the conclusion of her leave. (Doc. 47 ¶ 27; Doc. 32–4 at 47.)

Defendant disputes this version of events and offers evidence that Mr. Waters reached the decision to fire Ms. Gutter on July 12, 2010, before she requested FMLA leave. (Waters Dep., Doc. 35 at 114.) That same day, Mr. Waters discussed this decision with Marsha Levisay on July 12, 2010, who at the time was employed as a Human Resources Consultant at GuideOne. (Id.; Levisay Decl., Doc. 32–9 ¶¶ 2, 6–7.) Defendant contends that, after Mr. Waters decided to fire Ms. Gutter on July 12th, he called her on July 13, 2010 "at the end of the day" to schedule a face-to-face meeting at the Stone Mountain location. (Doc. 35 at 111, 114–115.) During this call, Mr. Waters told Ms. Gutter that she was fired but could continue working

through August 13th as a "professional courtesy." (Id. at 111–115.) Mr. Waters asserts that he had no knowledge of Ms. Gutter's FMLA leave request when he made the decision to fire her or when he actually terminated her position. (Id. at 108–110.)

Mr. Waters has also testified that he drafted a memo titled "MEMORANDUM TO FILE" on July 13, 2010 (the "July 13th Memo") that documents his phone call with Ms. Gutter. (Waters Supp. Decl. Ex. B., Doc. 48 at 17, 22.) This memo is dated July 13, 2010 and appears to be signed by Mr. Waters; it describes how he told Ms. Gutter that she was fired at 4:30 p.m. that day. (Id. at 22.) The July 13th Memo also describes the transition plan for her replacement and states that GuideOne would allow Ms. Gutter to continue working until August 13, 2010. (Id. at 22.)

Ms. Gutter denies that she and Mr. Waters discussed her termination on July

---

3. Ms. Gutter's testimony is not consistent as to the date of this conversation with Mr. Waters. In her declaration she states this conversation occurred on July 14th, but in her deposition she states this conversation happened on July 15th.

13th. Additionally, Plaintiff initially objected to Defendant's use of Ms. Levisay's declaration in support of its motion for summary judgment because Defendant failed to disclose Ms. Levisay in its initial disclosures as a witness with discoverable information. (*See* Doc. 8 ¶ 5; Doc. 43–2 ¶ 2.) In response, the Court granted Plaintiff the opportunity to depose Ms. Levisay and to supplement its opposition to Defendant's Motion for Summary Judgment. (Order, Doc. 50.)

Plaintiff filed this case on July 10, 2012, asserting claims for interference and retaliation in violation of her FMLA rights under 29 U.S.C. § 2601 *et seq.* (Doc. 1 ¶ 1.)

## II. Legal Standard

The Court must grant summary judgment if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249, 106 S.Ct. 2505.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324–26, 106 S.Ct. 2548. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

## III. Discussion

### A. FMLA Provisions

 The FMLA creates two different types of claims: "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act; and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in an activity protected by the Act." *Pereda v. Brookdale Senior Living Communities, Inc.,* 666 F.3d 1269, 1272 (11th Cir.2012) (citing *Strickland v. Water Works & Sewer Bd. of City of Birmingham,* 239 F.3d 1199, 1206 (11th Cir.2001)).

Plaintiff has raised both interference and retaliation claims against Defendant. Under the FMLA, eligible employees [4] are entitled to twelve weeks of unpaid leave in any one-year period "[b]ecause of a serious health condition that makes the employee

---

4. "[A]n eligible employee is one who has worked for at least 12 months, and for at least 1,250 hours during the previous 12–month period." *Pereda,* 666 F.3d at 1272 n. 3 (citing 29 U.S.C. § 2611(2)). Plaintiff was an eligible employee under the FMLA.

unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "Following FMLA leave, an employee has the right 'to be restored by the employer to the position of employment held by the employee when the leave commenced' or to an equivalent position." *Leach v. State Farm Mut. Auto. Ins. Co.,* 431 Fed.Appx. 771, 775 (11th Cir.2011) (quoting 29 U.S.C. § 2612(a)(1)).

Plaintiff argues that GuideOne's termination of her position interfered with her right to reinstatement, and alternatively, was retaliation against her for exercising her FMLA rights. Defendant seeks summary judgment on both Plaintiff's FMLA interference and retaliation claims. According to Defendant, the undisputed facts detail Plaintiff's significant history of poor performance at GuideOne. Defendant argues that Plaintiff was fired solely because of her unacceptable conduct and that Mr. Waters was unaware of Plaintiff's intent to take FMLA leave when he decided to fire her. Thus, Defendant contends that Plaintiff's termination was completely independent from her FMLA request, and summary judgment on both claims is appropriate.

## B. Time of Firing

As an initial matter, both Plaintiff's interference and retaliation claims raise the threshold issue of exactly when Mr. Waters made the decision to fire Ms. Gutter. The timing of this decision relative to Ms. Gutter's FMLA leave request is central to her claims that GuideOne interfered with the exercise of her rights under the FMLA or retaliated against her for invoking

them, and is also central to GuideOne's defenses. Thus, the Court begins its analysis of Defendant's motion by examining the record evidence regarding the timing of Mr. Waters' decision.

The parties dispute the series of events leading up to Ms. Gutter's termination. Defendant argues that Mr. Waters made the decision to fire Ms. Gutter on July 12, 2010 and discussed this with Ms. Levisay on the same day. Defendant contends that Mr. Waters informed Ms. Gutter of his decision over the phone at the end of the day on July 13, 2010 and that Ms. Gutter made her first FMLA leave request afterwards in her 9:13 p.m. e-mail to Cathy Murray that day. Defendant argues that the July 14, 2010 e-mail confirming her termination simply memorialized the events of the previous day and does not indicate that she was actually fired on July 14th.

In contrast, Plaintiff argues that she alerted GuideOne of her intent to take FMLA leave twice before the decision was made to terminate her. Plaintiff argues that Mr. Waters' July 12th decision date is contradicted by the documents in the record. Ms. Gutter testified that, on the afternoon of July 13, 2010, she first told Mr. Waters about her doctor's appointment the following day and that she was going to request FMLA leave.[5] Plaintiff argues that Ms. Gutter's e-mail to Cathy Murray that evening was also made before she was fired. Ms. Gutter testified that she first learned of her termination in a July 14, 2010 phone call with Mr. Waters.

---

**5.** Plaintiff further asserts that she "notified Mr. Waters of her need for FMLA leave in April or May 2010" before her July 13, 2010 request. While Ms. Gutter communicated that she "might" have to take medical leave in the future (Doc. 39 at 78), this notice does not appear to be "sufficient to make the em-

ployer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave." *Cruz v. Publix Super Markets, Inc.,* 428 F.3d 1379, 1383 (11th Cir.2005) (quoting 29 C.F.R. § 825.302(c)).

The record here is in dispute regarding when Mr. Waters first told Ms. Gutter that she was fired. It is unclear whether Ms. Gutter notified Mr. Waters of her intended FMLA leave over the phone before he decided to fire her, or if instead he fired Ms. Gutter before she made a subsequent request for FMLA leave to Cathy Murray. Ms. Gutter directly challenges Mr. Waters' recollection of their July 13th phone conversation; she testified that she told Mr. Waters of her request for medical leave on July 13th and that Mr. Waters terminated her the following day. The earliest electronically dated document that contemplates Ms. Gutter's termination—Mr. Waters' e-mail that confirms Ms. Gutter's termination—is dated July 14, 2010 at 1:54 p.m., the day after the disputed phone calls.

It is equally disputed when Mr. Waters actually reached the decision to fire Ms. Gutter. There is no documentation to support his claim that he reached this decision on July 12th. Plaintiff argues that Defendant never disclosed the July 12th decision date in written discovery and notes how Mr. Waters' testimony to this end was made after Ms. Gutter offered testimony that she spoke to him on July 13th about her FMLA request. (*See* Doc. 43 ¶ 77.) While Ms. Levisay did testify that Mr. Waters discussed his decision with her on July 12th, she admits in deposition that their conversation took place the day before Ms. Gutter was fired and may actually have occurred on July 13th. (Levisay Dep., Doc. 53 at 33–35.) And, as discussed further below, the record does not identify a specific event *following* Ms. Gutter's final performance evaluation that precipitated Mr. Waters' decision.

Based on this evidence, a reasonable jury could find that Ms. Gutter notified Mr. Waters of her intent to take FMLA leave on July 13, 2010, before Mr. Waters decided to terminate her employment. Likewise, a reasonable jury could also find that Ms. Gutter was fired on July 14th, one day after requesting FMLA leave. The Court concludes that the record gives rise to multiple inferences both regarding when Mr. Waters decided to fire Ms. Gutter and when that decision was actually communicated to her. With this in mind, the Court turns to the merits of Defendant's Motion for Summary Judgment.

## C. FMLA Interference

An interference claim arises where an employee is denied a benefit to which she is entitled under the FMLA. *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1266–67 (11th Cir.2008) (citing 29 U.S.C. § 2615(a)(2)). Following FMLA leave, "[a]n employee has the right . . . 'to be restored by the employer to the position of employment held by the employee when the leave commenced' or to an equivalent position." *Martin*, 543 F.3d at 1267 (quoting 29 U.S.C. § 2614(a)(1)(A)). "To establish a [FMLA] interference claim, an employee need only demonstrate by a preponderance of the evidence that [s]he was entitled to the benefit denied." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir.2006) (internal citation omitted). Interference claims do not require employees to show that the employer intended to deny an FMLA right. *Martin*, 543 F.3d at 1267. However, employers can assert lack of causation as an affirmative defense. *Spakes v. Broward County Sheriff's Office*, 631 F.3d 1307, 1309 (11th Cir.2011). By raising this defense, an employer may properly deny reinstatement "if it can demonstrate that it would have discharged the employee had [s]he not been on FMLA leave." *Strickland*, 239 F.3d at 1208.

Plaintiff alleges that GuideOne interfered with Ms. Gutter's right to take

FMLA leave by terminating her employment instead of allowing her to return to her position at the end of her leave. (Pl.'s Br. Opp., Doc. 42 at 7–8.) Defendant contends that Ms. Gutter was fired because of her unacceptable job performance and not because of her FMLA request. (Def.'s Br., Doc. 32–2 at 24.) Arguing for summary judgment, Defendant relies on its documentation of Ms. Gutter's ongoing performance issues as evidence that GuideOne possessed grounds to terminate her position regardless of her FMLA leave. (*Id.*) It is undisputed that Ms. Gutter was placed on a PIP on September 10, 2009 because she was not meeting specific goals, and she understood that to keep her job, her performance needed to improve. Furthermore, Ms. Gutter's last annual performance review on April 5, 2010—covering the duration of her PIP—was poor and admittedly worse than any she had received during her time at GuideOne. (Doc. 39 at 113.)

Yet, there is evidence indicating that Ms. Gutter may have addressed her shortcomings and improved her performance. There is no question that Ms. Gutter was removed from the PIP on February 1, 2010. She began receiving new files at that time, and in March 2010 she received a bonus of several thousand dollars. (Doc. 35 at 72.) According to the terms of the PIP, Ms. Gutter's removal from the PIP was conditioned on raising her performance to an acceptable level and addressing three specific performance issues. (Doc. 32–3 at 46.) While Mr. Waters claims that he removed Ms. Gutter from the PIP because he "felt sorry for her" and wanted her to receive a bonus, the record could reasonably support a finding that she was removed from the PIP because she successfully met the goals of the PIP. (Doc. 35 at 73.)

In Ms. Gutter's April 5, 2010 review, Mr. Waters gave her strong critical feedback that described areas in which she could improve. But Mr. Waters did not assign her a rating of "unacceptable" in any of the twelve scored employment skills. Rather, she received scores of "needs improvement" and "meets expectations." This review tasked Ms. Gutter with creating a development plan to address her performance shortcomings and stated that she would be reevaluated in six months. Ms. Gutter claims that during her performance review Mr. Waters said her performance had improved to satisfactory levels. (Gutter. Decl., Doc. 44–1 ¶¶ 10–11.) This evidence, if found credible, could support an inference that, as of the April 5, 2010 review, Mr. Waters did not consider Ms. Gutter's job performance as unacceptable and that they agreed on a plan to resolve her outstanding performance issues.

In sum, the record up to Ms. Gutter's PIP and final performance review does not lead to the inevitable conclusion that GuideOne would terminate Ms. Gutter's employment approximately three months later. At this point, the Court examines the testimony of Mr. Waters and Ms. Levisay to discern whether Defendant can show that it fired Ms. Gutter "for a reason wholly unrelated to [her] FMLA leave." *Strickland*, 239 F.3d at 1208.

According to Mr. Waters, he made the decision to fire Ms. Gutter based on continuing complaints to him from the Claims Department about her performance.[6]

---

6. Defendant argues that Mr. Waters' decision was also motivated by Ms. Gutter's failure to attend a doctor's deposition and her failure to appear for part of a trial. (Doc. 32–2 at 12–13.) This is unsupported by Mr. Waters' testimony. Mr. Waters explicitly testified that the missed trial did not result in Ms. Gutter's termination. (Doc. 35 at 67–69.) Additional-

(Doc. 35 at 111–115.) Specifically, the Claims Department took issue with Ms. Gutter's poor performance and her continued friction with the legal support staff. (*Id.* at 111.) Mr. Waters testified that he had "several" conversations periodically and over an undefined period of time with the Claims Department about Ms. Gutter's performance.[7] (*Id.* at 113–114.) Mr. Waters does not believe there is any documentation about these conversations, but he testifies there are "probably plenty of e-mails" documenting the Claims Department's frustration with Ms. Gutter. (*Id.* at 113.) However, Mr. Waters' testimony indicates that his relevant exchanges with the Claims Department were limited to verbal "conversation[s]" or "discussions" and not e-mails. (*Id.* at 110–114.) It is unclear if the Claims Department e-mailed Mr. Waters a written criticism of Ms. Gutter in the period between her final performance evaluation and her termination. The record does not contain such an e-mail, or any other documentation of complaints by the Claims Department.

Mr. Waters testified that "the pressure [from the Claims Department] just got to the point where I couldn't take any more because [Ms. Gutter] wasn't improving." (*Id.* at 111.) At this point, he "just decided on Monday ... the 12th" that he would fire Ms. Gutter and spoke to Marsha Levisay about the next steps. (*Id.* at 114.) Ms. Levisay testified that Mr. Waters discussed his decision with her. (Doc. 32–9 ¶¶ 6–8.) However, Ms. Levisay's testimony makes no mention of complaints from the Claims Department; instead, Ms. Levisay's recollection is that Ms. Gutter frequently failed to update her electronic case files. (*Id.* ¶ 4; Doc. 53 at 31.)

In response, Plaintiff contends that Mr. Waters never informed Ms. Gutter of any problems or performance issues following her last performance evaluation. (Doc. 39–1 at 6–7.) Mr. Waters told her just the opposite: that "everything was fine." (*Id.* at 6.) Ms. Gutter testified that, between the point she completed the PIP and her termination, "Mr. Waters would have told me that there were complaints [from the Claims Department] if there were any because, in my experience with Mr. Waters he would tell me if there were issues with my performance." (Doc. 44–1 ¶¶ 13–14.) She makes the same assertion about complaints Mr. Waters might have received from the legal support staff. (*Id.* ¶¶ 15–16.)

Mr. Waters' decision to fire Ms. Gutter based on complaints he received from the Claims Department stands alone in the record. There is no e-mail, document, supporting testimony, or other evidence offered that reinforces how Mr. Waters reached this decision. In other words, the record lacks evidence of a specific event that triggered Mr. Waters' decision to terminate Ms. Gutter's employment. Plaintiff challenges Mr. Waters' testimony by arguing it is inconsistent with his past management history. Plaintiff contends that based on Ms. Gutter's experience with Mr. Waters, he would have likely informed her of complaints he received from other departments and argues that his failure to do so calls into question GuideOne's stated reason for terminating Ms. Gutter.[8]

---

ly, Mr. Waters discussed this missed deposition in the context of her performance from March 2008 to March 2009—well before Ms. Gutter's final performance review. (*Id.* at 67.)

**7.** Mr. Waters stated that Wayne Visconti, the branch manager, or his subordinate Roger

Crowley, would call him on behalf of the Claims Department. (*Id.* at 113.)

**8.** In challenging Mr. Waters' testimony, Plaintiff has avoided offering impermissible evidence simply asserting that her performance was in fact satisfactory. *See Alvarez v. Royal*

Twice in his testimony, Mr. Waters cited "pressure" from the Claims Department as the motivating factor behind his decision to fire Ms. Gutter. (Doc. 35 at 111, 114.) However, in the absence of documentation of a single specific complaint from the Claims Department, a reasonable jury could infer that this pressure became unbearable only after Ms. Gutter made her FMLA request. Mr. Waters also testified that he "talked to [Ms. Gutter] an awful lot. Sometimes two or three times a day. At least twice a week...." (Doc. 35 at 93.) The same jury could also surmise that, in light of the frequent communication between the two, Mr. Waters' failure to mention any complaints from the Claims Department to her is inconsistent with the rising pressure he described.

Ultimately, Defendant's affirmative defense to Plaintiff's interference claim rests on the testimony of Mr. Waters. The record here would allow a reasonable jury to either accept or reject Mr. Waters' version of events. In either case, the circumstantial nature of the record would require a factfinder to make credibility determinations which are beyond the function of the Court on a motion for summary judgment. *See Reeves*, 530 U.S. at 150–151, 120 S.Ct. 2097. Because there exists a genuine dispute of fact over whether GuideOne's decision to fire Ms. Gutter was unrelated to her FMLA-protected leave, the Court **DENIES** summary judgment for the Defendant on Plaintiff's FMLA interference claim.

### D. FMLA Retaliation

■■■ Plaintiff's second FMLA claim is for retaliation. Plaintiff argues that her employment was terminated by GuideOne because she requested FMLA leave. (Doc. 42 at 11.) "[T]o succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right." *Strickland*, 239 F.3d at 1207. An employee asserting a retaliation claim has the added burden of "showing that [her] employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Martin*, 543 F.3d at 1267–68 (quoting *Strickland*, 239 F.3d at 1207).

■■■ Where, as here, a plaintiff does not present direct evidence of the employer's impermissible intent, retaliation claims are governed by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Hurlbert*, 439 F.3d at 1297. Under this approach, an employee must first make a prima facie showing of FMLA retaliation by establishing that: "(1) [s]he engaged in statutorily protected activity, (2) [s]he suffered an adverse employment decision, and (3) the decision was causally related to the protected activity." *Martin*, 543 F.3d at 1268. Once an employee makes this prima facie showing, the burden then shifts to the employer "to articulate a legitimate reason for the adverse action." *Id.* If the employer does, the burden then shifts back to the employee to show that this reason is pretext for unlawful discrimination. *Id.*

### 1. Causation

■■■ Defendant first argues that Plaintiff cannot establish the third element of her prima facie retaliation claim. Defendant contends that Plaintiff cannot show

*Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir.2010) (in the context of a Title VII claim, courts "must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees" (quoting *Rojas v. Florida*, 285 F.3d 1339,1342 (11th Cir.2002))).

any casual link between Ms. Gutter's FMLA leave request and her termination. (Doc. 32–2 at 16–17.) According to Defendant, the evidence shows that Mr. Waters decided to terminate Ms. Gutter before she made an FMLA leave request, therefore her termination could not be based on the exercise of her rights under the FMLA.

 The causal connection element of a prima facie FMLA retaliation claim "is satisfied if a plaintiff shows that the protected activity and adverse action were not wholly unrelated." *Krutzig v. Pulte Home Corp.,* 602 F.3d 1231, 1234 (11th Cir.2010). A plaintiff can meet this burden by showing "that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Id.* Generally, "close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Brungart v. BellSouth Telecommunications, Inc.,* 231 F.3d 791, 799 (11th Cir.2000). However, temporal proximity alone cannot establish causation if there is unrebutted evidence that Mr. Waters did not know of Ms. Gutter's FMLA request. *See id.*

As explained above, the record is unclear as to precisely what prompted Mr. Waters' decision to fire Ms. Gutter and when he made it. There exist genuine issues of material fact regarding the timing of Mr. Waters' decision, and as a result, whether he had knowledge of Ms. Gutter's FMLA request at the time of his decision. This factual dispute, combined with the "close temporal proximity" between Ms. Gutter's July 13th request for FMLA leave and her July 14th termination, is "suffi-

cient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Hurlbert,* 439 F.3d at 1298 (quotation omitted); *see also Brungart,* 231 F.3d at 799; *Bechtel Const. Co. v. Sec'y of Labor,* 50 F.3d 926, 934 (11th Cir.1995).

Based on these facts, a jury could reasonably infer that Mr. Waters obtained prior knowledge of Ms. Gutter's request for FMLA leave directly before he terminated her. *See Hurlbert,* 439 F.3d at 1298. Plaintiff thus has established a prima facie claim of retaliation.[9]

### 2. Pretext

 Defendant next challenges Plaintiff's ability to establish that GuideOne's stated reason for terminating Ms. Gutter was pretext for unlawful discrimination. (Doc. 32–2 at 20.) Because Defendant asserts that it terminated Ms. Gutter for her poor performance (*see id.*), Plaintiff is required to show that this proffered reason is pretextual. *Hurlbert,* 439 F.3d at 1297. An employee can meet this burden by showing that the proffered reason is not credible. *Alvarez v. Royal Atl. Developers, Inc.,* 610 F.3d 1253, 1265 (11th Cir.2010). Where the proffered reason is "one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason." *Alvarez,* 610 F.3d at 1266 (11th Cir.2010) (quoting *Chapman v. AI Transp.,* 229 F.3d 1012, 1030 (11th Cir.2000)).

 Here, Plaintiff may show pretext by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [GuideOne's]

9. Defendant does not challenge Plaintiff on the other two elements of her prima facie

retaliation claim. (*See* Doc. 32–2 at 16.)

proffered legitimate reasons" for firing Ms. Gutter such that a reasonable factfinder could question their credibility. *Alvarez*, 610 F.3d at 1265 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997)). Additionally, temporal proximity is evidence of pretext, even though it does not establish pretext by itself. *Jackson v. Hennessy Auto*, 190 Fed.Appx. 765, 768 (11th Cir.2006); *Hurlbert*, 439 F.3d at 1298 (finding a period of "no more than two weeks" as evidence of pretext).

Defendant argues that Plaintiff cannot show that Ms. Gutter's documented history of disappointing performance served as pretext for unlawful discrimination. Defendant believes that Ms. Gutter's poor reviews, recurring conflicts with litigation support staff, and failure to adequately perform critical tasks cannot be dismissed as pretextual. (Doc. 32–2 at 21–23.)

Plaintiff need not challenge these reasons as pretextual because they are not the factors Mr. Waters relied upon when he decided to terminate Ms. Gutter's employment at GuideOne. Mr. Waters testified that his decision was based upon complaints he received from the Claims Department about Ms. Gutter. As discussed above, Mr. Waters' proffered reason for firing Ms. Gutter raises questions of credibility and inconsistencies in the evidence that form the basis of material factual disputes. These factual disputes relate to the plausibility of Mr. Waters' testimony and explanation of his termination decision. Plaintiff avoids impermissible challenges to the "wisdom" or "fair[ness]" of his decision. *Alvarez*, 610 F.3d at 1266. And, also for the reasons discussed above, a jury could reasonably infer that there was a one-day period between Ms. Gutter's request for leave and her termination, providing strong circumstantial evidence of pretext. On the other hand, Mr. Waters' testimony in connection with other evidence may be compelling and sufficient to persuade a jury that his reasons for Ms. Gutter's termination were not pretextual.

Based on the record, a reasonable jury could infer from the evidence challenging Mr. Waters' testimony that Ms. Gutter's termination was precipitated by her request for FMLA leave, and that GuideOne's proffered reason is pretextual. Alternatively, a jury could determine that GuideOne terminated Ms. Gutter for legitimate, non-discriminatory reasons and that Mr. Waters made the decision to terminate Ms. Gutter independent of her leave request. Accordingly, Defendant's Motion for Summary Judgment is **DENIED** on Plaintiff's retaliation claim.

## IV. Conclusion

For the reasons described above, Defendant's Motion for Summary Judgment [Doc. 32] is **DENIED**. The parties are **DIRECTED** to engage in mediation and notify the Courtroom Deputy Clerk within 10 days of the date of this Order whether they will obtain a private mediator or if they desire the Court to appoint a Magistrate Judge to conduct the mediation. Mediation is to be concluded by May 16, 2014. If the case has not settled by May 16, 2014, the parties are **DIRECTED** to file a status report with the Court by that date and submit their proposed pretrial order by June 6, 2014.

**IT IS SO ORDERED.**